UNION COUNTY TRUST COMPANY, A CORPORATION, AD-
MINISTRATOR OF THE ESTATE OF ANTONI TRACHO-
MOWICZ, DECEASED, APPELLANT. v. JAMES C. DAVIS,
DIRECTOR GENERAL OF RAILROADS, AS AGENT, RE-
SPONDENT.

Submitted December 5, 1921—Decided March 6, 1922.

1. A gang of six men, of whom plaintiff's intestate was one, were, with a foreman, called a checker, engaged in moving and unloading coal cars upon a trestle of the defendant. The foreman was observed to say something to decedent, who immediately went between two empty cars to do work connected with their proper operation, when the checker signaled to the brakeman of a loaded car to come down the incline on the trestle, causing the crushing of the decedent between the two empty cars. *Held*, that whether the defendant was negligent was clearly a question for the jury.

2. Under the facts recited, there was no assumption of risk by the decedent in going between the empty cars, it appearing that the loaded car could not come down the trestle without being released by human agency, and was only released after a signal given by the foreman.

3. Under the Federal Employers' Liability act neither the negligence of a superior servant nor of a co-servant will bar recovery.

4. In an action under the Federal Employers' Liability act an injured employe is debarred from maintaining an action where his injury is the result of a risk of danger incidental to his employment of which he had knowledge, or could, in the exercise of reasonable care, have become possessed of such knowledge.

On appeal from the Supreme Court.

For the appellant, *Charles Hershenstein*.

For the respondent, *George Holmes* and *Devoe Tomlinson*.

The opinion of the court was delivered by

KALISCH, J. The plaintiff-appellant appeals from a judgment of nonsuit awarded against it at the Union Circuit. The action was instituted under the Federal Employers' Liability act of 1908, to recover from the defendant, under

the Death act of this state for the benefit of the widow and next of kin of Antoni Trachomowicz, deceased, the pecuniary loss sustained by them by reason of the death of Antoni, which was alleged to have been caused by the negligence of the Central Railroad Company of New Jersey, which was under the control of the defendant-respondent.

The fundamental question presented by the grounds of appeal is whether the action of the trial judge in taking the case away from the jury and directing a nonsuit was error. We have reached the conclusion that it was, for the reason that the facts clearly presented a question which was for the jury to pass upon, namely, as to the alleged negligence of the defendant.

The facts are these: The deceased was working, at the time of the happening of the accident which caused his death, in the coal docks of the Central Railroad Company, which docks consisted of a long pier upon which was a trestle running along the entire length of the pier, both pier and trestle extending from Elizabethport out into the waters of the Kill von Kull. On this trestle the railroad company maintained four tracks which were laid on an incline, ascending from the shore and terminating at the end of the pier. At intervals along these tracks there were openings connecting with coal chutes, through which coal was dumped from loaded cars into vessels or boats standing below the trestle and alongside of the coal dock. The mode of operating the coal cars on the trestle was as follows:

It was a common practice for a locomotive engine to push a string of cars loaded with coal up the incline and out to the end of the trestle, which task accomplished the engine would detach itself and move off of the trestle. To keep the cars from moving, the brakes of each individual car were tightened, the cars were uncoupled and sprags put under the wheels.

The cars were then ready for unloading. This task was performed, customarily, by a crew, or gang of six men, acting under the orders of a checker. The cars would be unloaded,

one at a time, in this manner: First, the car would be un-coupled from the string of cars; the sprags would be removed from under the wheels and a pinch bar applied to the rear to put the car in motion, when by gravity it would run down the incline, under the care of one of the crew, who would ride on the loaded car and loosen the brakes, and when the car reached near the chute, designated by the checker as the place where the car was to be unloaded, the brakes would be ap-plied for that purpose, and when the car was stopped the checker would put a sprag under one of the wheels, and the brakes released, and then the gang of six men would dump the car, permitting it to stand empty over the chute. It was the checker who gave orders for the movement of the cars by calling out, "All right" or "Let her go." It was customary when the next car of the string of cars was to be unloaded that the person who attended to the brakes of the unloaded cars would unloosen the brakes and one of the crew would apply the pinch bar; the check upon the wheels would be removed, and at the command of the checker the car would be sent on its journey down the incline and proceed along until it struck the empty car standing over the chute, and by force of the impact displacing the empty car and shoving it down the incline and taking its place to undergo the same process of unloading. It further appeared that in addition to the gang of six, there was a brakeman employed, whose duty it was after the impact was had by the loaded car with the unloaded one to jump on the unloaded car to attend to the brakes so as to control its descent down the incline to prevent injury to other gangs of workmen who were working further down the trestle. In the absence of the brakeman the checker would designate some one of the gang to take his place.

On two or three occasions the plaintiff's decedent had acted as brakeman on such empty cars at the direction of the checker.

There was testimony tending to establish that on the day when decedent met with his fatal injuries he was working in a gang of six men under the direction of a foreman, called a

checker.  Two or three coal cars had already been unloaded, according to the customary method above described; the brakeman who was charged with the duty to attend to the brakes of the unloaded car after it had been pushed over the chute was absent; a loaded car had been emptied and was standing over the chute, and another empty car was standing a few feet further down the incline; the decedent was standing with a fellow-workman near the checker; the checker turned to the decedent and spoke to him in the Lithuanian language, whereupon the decedent immediately went upon the tracks between the two empty cars, stooped down and looked at the brake or chain of the empty car standing beyond the chute, and while in this position, between the two empty cars, examining such brake or chain, the checker signaled to the brakeman of a loaded car to come down the incline, with the result that the loaded car struck the empty one standing over the chute, which impact caused the latter to strike against the empty car, the chain or brake of which the decedent was examining, thereby crushing him.  At the time this happened the checker was standing alongside of the empty car over the chute.

It further appeared that none of the gang of workmen understood the Lithuanian language, and, therefore, what the checker said to the decedent before the latter proceeded to go between the two empty cars fell upon deaf ears, but that fact did not eliminate the circumstance that something was said by the checker to the decedent who immediately, as if obeying a command, went between the two empty cars and did something incidental to their operations.  The direct or positive testimony tended to establish that the checker spoke to the decedent, whereupon the latter, immediately upon being spoken to, left the place where he was standing and went between the two empty cars and began doing something there to the brake or chain, and that the checker saw the decedent go between the cars.  Whether or not what the checker said to the decedent was an order or command to go between the empty cars to do the work which the decedent

was doing, or whether the latter went there on his own voli-
tion, were not court questions but questions of fact for the
decision of the jury. No good reason has been or can be ad-
vanced why it was not the province of circumstantial evi-
dence, in the absence of direct or positive testimony of what
was said to the decedent by the checker before the former
went between the two empty cars, to establish that what was
said by the checker was in the nature of an order or com-
mand to the deceased. This involved the task of drawing
natural inferences from the conduct of the parties. That
duty was peculiarly within the province of the jury. For it
must be conceded that what it was the checker said to dece-
dent was a question of fact to be translated by the jury from
the conduct of the parties into speech.

Thus, for example, if a building is in course of erection
and the foreman is seen speaking to one of the employes who
immediately scales a ladder against the building, though
what was said by the foreman was not heard, the presump-
tion of fact would be that the employe was obeying the com-
mand of his superior. And so soldiers at drill, going through
military evolutions, an officer is observed saying something
to them, but what he says is not heard by bystanders, yet,
the natural presumption would be that the officer was giving
commands and the soldiers were obeying them. And so, here,
in the present case, a gang of six men, with a foreman, called
a checker, in command, were engaged in moving and unload-
ing cars, the foreman is observed saying something to the de-
cedent, who immediately goes between two empty cars to do
work connected with their proper operation, and, therefore,
it is quite plain that the natural presumption of fact is that
the decedent went there at the direction of the foreman.
But we need not pursue this topic any further, for even if it
be assumed that the foreman gave no such order or direction
to the deceased, nevertheless the prominent facts still remain
undisturbed in their probative effect of establishing negli-
gence for the consequences of which the defendant is answer-
able, namely, that the foreman assigned the deceased to do

brake duty that morning and saw the latter go between the empty cars and take a position which precluded him from seeing or hearing any signal given by the foreman to send down a loaded car. The foreman was therefore chargeable with knowledge that the deceased was in a situation where he was unable to look out for his own safety, and, hence, a duty was devolved upon the foreman to use reasonable care to ascertain whether the deceased was still between the cars, and if so to give him warning, before signaling to those in charge of the loaded car to send it down. According to the evidence, the foreman made default in this duty. Without making any effort to ascertain whether the decedent was still between the cars and in a place of safety, the foreman signaled the men under him in charge of the loaded car to let it come down, and it was this conduct which caused the accident and the resultant injury and death of the decedent.

The respondent seeks to sustain the judgment of nonsuit on the theory that the decedent assumed a risk of danger in going between the empty cars, but that is obviously not so.

Under the Federal Employers' Liability act neither the negligence of a superior servant nor of a co-servant, and not even the negligence of the servant injured contributing to his injury will debar his right of recovery. But he is debarred from maintaining an action where his injury is the result of a risk of danger incidental to his employment of which he has knowledge or could in the exercise of reasonable care have become possessed of such knowledge.

Now, it is too clear to need extended discussion that there was no risk of danger to go between the empty cars with the knowledge of the foreman who was to give the signal to let the loaded car come down. For it appears that the loaded car could not come down without its being released by human agency. The sprags under the wheels were required to be removed, the brakes unloosened and the pinch bar applied to give the car motion, and all this was done after signal from the foreman to let the car come down. This situation makes it quite apparent that there was no risk of danger incident

to the employment in the operation of the cars, but that a jury might properly say that the danger was created by the act of the foreman in negligently causing a loaded car to come down without giving the deceased notice or warning, so that the latter might seek a place of safety.

For the reasons given the judgment will be reversed and a *venire de novo* awarded.

*For affirmance*—THE CHANCELLOR, BERGEN, BLACK, KATZENBACH, WILLIAMS, JJ. 5.

*For reversal*—THE CHIEF JUSTICE, SWAYZE, TRENCHARD, PARKER, MINTURN, KALISCH, WHITE, HEPPENHEIMER, GARDNER, ACKERSON, VAN BUSKIRK, JJ. 11.